UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JULIAN METTER,

          Plaintiff,

    v.

UBER TECHNOLOGIES, INC.,

          Defendant.

Case No. 16-cv-06652-RS

**ORDER DENYING DEFENDANT UBER'S MOTION TO COMPEL ARBITRATION**

## I. INTRODUCTION

Defendant Uber Technologies, Inc. ("Uber") moves to compel arbitration in this putative class action filed by plaintiff Julian Metter. Because Metter raises a genuine issue of fact as to whether he assented to Ubers terms of service and arbitration agreement therein, Uber's motion is denied.

## II. BACKGROUND

On October 24, 2014, Metter created an account on the Uber ride-sharing app. The app was installed on Metter's Samsung Galaxy S4 phone, which ran the Android operating system. On August 7, 2015, Metter used the Uber app to request a ride in Seattle. Metter's requested ride did not appear after five minutes, leading him to call the driver. The driver told Metter he could not reach Metter's location, and that Metter would have to cancel the requested ride and request a new one. Metter cancelled the ride, and ultimately obtained one from a different driver. Later, Metter learned he had been assessed a $5 fee for cancelling his first ride request. This putative

United States District Court
Northern District of California

United States District Court
Northern District of California

1    class action advancing four claims for relief against Uber followed, claiming "Uber's cancellation

2    fees are arbitrarily imposed against Riders who are not informed in advance of contracting for a

3    ride that such fees, including the specific amount of the fees, may be automatically charged to

4    their credit cards," Compl. ¶ 2.  In response, Uber filed this motion to compel arbitration,

5    claiming Metter agreed to Uber's terms of service which mandate arbitration of this dispute.[1]

6          As will become clear, the registration process Metter went through when creating his Uber

7    account is of paramount importance in deciding this motion.  That process featured two screens.

8    The first asked for Metter's name, email address, and phone number, along with a password for

9    his new account.  *See* Appendix, Figure 1.  The next screen sought his credit card number,

10   expiration date, security code, and billing zip code.  It also featured a large "REGISTER" button

11   that allowed Metter to complete the registration process.  At the bottom of the screen, the

12   following alert was displayed:  "BY CREATING AN UBER ACCOUNT, YOU AGREE TO THE

13   **TERMS OF SERVICE & PRIVACY POLICY**."  The bold, underlined portion of this alert is a

14   clickable hyperlink to Uber's terms of service, which contain the arbitration provision Uber now

15   seeks to invoke.  *See* Appendix, Figure 2.  When Metter tapped any of the numerical information

16   fields on this screen, like the "Credit Card Number" field, a keypad popped up allowing him to

17   enter numerical information.  The keypad would have remained activated for as long as Metter

18

19   _____

20   [1] According to Uber, the terms of service Metter agreed to contained the following arbitration
     agreement:  "You and Company agree that any dispute, claim or controversy arising out of or
     relating to this Agreement or the breach, termination, enforcement, interpretation or validity
21   thereof or the use of the Service or Application (collectively, 'Disputes') will be settled by binding
     arbitration, except that each party retains the right to bring an individual action in small claims
22   court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction
     to prevent the actual or threatened infringement, misappropriation or violation of a party's
23   copyrights, trademarks, trade secrets, patents or other intellectual property rights.  You
     acknowledge and agree that you and Company are each waiving the right to a trial by jury or to
24   participate as a plaintiff or class User in any purported class action or representative proceeding.
     Further, unless both you and Company otherwise agree in writing, the arbitrator may not
25   consolidate more than one person's claims, and may not otherwise preside over any form of any
     class or representative proceeding.  If this specific paragraph is held unenforceable, then the
26   entirety of this 'Dispute Resolution' section will be deemed void.  Except as provided in the
     preceding sentence, this 'Dispute Resolution' section will survive any termination of this
27   Agreement."  Mot. to Compel Arbitration 6.

28

1  entered numerical information, and until Metter pressed "REGISTER" to complete the registration

2  process.  The keypad obstructed the previously visible terms of service alert.  *See* Appendix,

3  Figure 3.  Had Metter scrolled down on this page, the terms of service alert would have returned to

4  view, even if the pop-up keypad remained activated.  *See* Appendix, Figure 4.  Metter successfully

5  registered for an account through this registration process.

## III.  LEGAL STANDARD

7  Because Uber's terms of service are "a contract evidencing a transaction involving

8  commerce," they are subject to the Federal Arbitration Act ("FAA").  9 U.S.C. § 2; *Chiron Corp.*

9  *v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  "The FAA provides that any

10  arbitration agreement within its scope 'shall be valid, irrevocable, and enforceable,' . . . and

11  permits a party 'aggrieved by the alleged . . . refusal of another to arbitrate' to petition any federal

12  district court for an order compelling arbitration in the manner provided for in the agreement."

13  *Chiron*, 207 F.3d at 1130 (quoting 9 U.S.C. § 4) (second omission in original).  The FAA "leaves

14  no place for the exercise of discretion by a district court, but instead mandates that district courts

15  shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has

16  been signed."  *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C.

17  §§ 3, 4).  The role of a district court under the FAA "is therefore limited to determining (1)

18  whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement

19  encompasses the dispute at issue."  *Chiron*, 207 F.3d at 1130 (citations omitted).  "If the response

20  is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration

21  agreement in accordance with its terms."  *Id.*

## IV.  DISCUSSION

23  Metter argues Uber's motion to compel arbitration should be denied because he never

24  agreed to Uber's terms and conditions, which are the source of the arbitration provision Uber

25  seeks to invoke.  "'Before a party to a lawsuit can be ordered to arbitrate . . . there should be an

26  express, unequivocal agreement to that effect.  Only when there is no genuine issue of fact

27  concerning the formation of the agreement should the court decide as a matter of law that the

United States District Court
Northern District of California

1   parties did or did not enter into such an agreement.'" *Three Valleys Mun. Water Dist. v. E.F.*

2   *Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (quoting *Par-Knit Mills, Inc. v. Stockbridge*

3   *Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980)). In deciding whether there is a genuine issue of fact

4   concerning formation of an agreement, the party opposing arbitration shall receive "'the benefit of

5   all reasonable doubts and inferences.'" *Id*. (quoting *Par-Knit Mills*, 636 F.2d at 54). "When

6   deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should

7   apply ordinary state-law principles that govern the formation of contracts." *First Options of*

8   *Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Under California law, mutual assent is the

9   key to contract formation. *See Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (1999). In

10  the context of an electronic consumer transaction, the occurrence of mutual assent ordinarily, as

11  here, turns on whether the consumer had reasonable notice of a merchant's terms of service

12  agreement. *See, e.g.*, *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1173 (9th Cir. 2014) ("We

13  agree with the district court that Barnes & Noble did not provide reasonable notice of its Terms of

14  Use, and that Nguyen therefore did not unambiguously manifest assent to the arbitration provision

15  contained therein."). Reasonable notice in this context requires that the consumer had either actual

16  or constructive notice of the terms of service; constructive notice occurs when the consumer has

17  inquiry notice of the terms of service ― like a hyperlinked alert ― and takes an affirmative action

18  to demonstrate assent to them. *See id.* at 1176-79.[2]

19      According to Uber, when Metter registered his Uber account, he would have been required

20  to click "REGISTER" to complete his sign-up process on a page displaying the alert: "BY

21  CREATING AN UBER ACCOUNT, YOU AGREE TO THE **TERMS OF SERVICE &**

22

23  _____

    [2] In determining whether the plaintiff "agreed to be bound by [the defendant] Barnes & Noble's
    Terms of Use" the *Nguyen* court purported to "apply New York law, to the extent possible." 763

24  F.3d at 1175. Although the court implicitly acknowledged the question was potentially one of
    California law, it did not decide if California or New York law should govern the question

25  "because both California and New York law dictate the same outcome." *Id.* In deciding the issue,
    the court cited to multiple cases applying California law. *See id.* at 1175-79. Accordingly,

26  *Nguyen* amounts to a binding decision of California law on the questions of notice and assent at
    the heart of this motion. The parties apparently agree, citing *Nguyen* in their briefs without

27  qualification.

28                                          ORDER DENYING UBER'S MOTION TO COMPEL ARBITRATION
                                                            CASE NO. 16-cv-06652-RS

1    **PRIVACY POLICY**." Mot. to Compel Arbitration 4; Cosentini Decl. 3. The bold, underlined

2    portion of this alert is a clickable hyperlink to Uber's terms of service, which contain the

3    arbitration provision Uber now seeks to invoke. Uber argues Metter affirmatively assented to its

4    terms of service by clicking "REGISTER" in the face of this alert. Metter disagrees, arguing that:

5    (1) the alert is not sufficiently conspicuous to put a registrant on notice that he is agreeing to

6    Uber's terms of service; (2) the alert is confusing and does not put the registrant on notice that he

7    is waiving his right to a jury trial; (3) the alert is an unenforceable "browsewrap" agreement; and

8    (4) in any event, a pop-up keypad enabling Metter to enter his credit card information blocked the

9    terms of service alert, preventing him from seeing it and thereby preventing him from assenting to

10   the terms of service.[3]

11           The first three of Metter's arguments are unavailing. To begin with, the alert informing

12   Metter he agreed to Uber's terms of service by registering an Uber account is not an unenforceable

13   "browsewrap agreement." *See Cordas v. Uber Techs., Inc.*, No. 16-CV-04065-RS, 2017 WL

14   658847, at *4 (N.D. Cal. Jan. 5, 2017) (explaining in detail why the equivalent notice in a related

15   case was not an unenforceable "browsewrap" agreement). Likewise, *generally speaking*, the

16   alert's font, size, color, and placement relative to the "REGISTER" button render it sufficiently

17   conspicuous to alert an Uber registrant that he is agreeing to Uber's terms of service. Finally, it is

18   immaterial that the alert itself does not indicate to an Uber registrant that he is waiving his right to

19   a jury trial by agreeing to the terms of service; Metter identifies no case requiring an explicit alert

20   of the sort. What matters is that the alert references and links to a terms of service agreement that

21   contains a valid arbitration provision. *See id.* at *2-3.

22           Metter's fourth argument, however, is well-taken. As he argues in response to Uber's

23   motion and attests in his declaration, when he reached the payment and registration page

24   displaying the terms of service alert, the alert itself would have been blocked by a keypad that

25

26   [3] The parties also dispute whether Uber's terms of service validly delegate to an arbitrator any
     question of abritrability. Because Metter has raised a genuine issue of fact as to whether an
27   agreement to arbitrate was formed, it is not necessary to resolve this dispute.

28                                               ORDER DENYING UBER'S MOTION TO COMPEL ARBITRATION
                                                                            CASE NO. 16-cv-06652-RS

1    popped up so that he could enter his credit card number and related payment information.

2    Accordingly, he claims to have never seen the terms of service agreement alert. Uber does not

3    dispute that such an obstruction occurred, but it argues the obstruction was irrelevant because

4    Metter could have seen the alert when he first reached the payment and registration screen, before

5    he began entering his credit card information, and that the alert itself would have been visible to

6    Metter while the pop-up keypad was visible, had Metter scrolled down to the bottom of the screen.

7    Uber's assertions, however, are not sufficient to obviate any dispute of fact as to whether Metter

8    was on notice of Uber's terms of service and thereby assented to them.

9          For one thing, Uber never explains why Metter would have scrolled down to find a terms

10    of service alert he was not otherwise aware of, especially when the registration and payment

11    screen neither instructed him to scroll down nor presented any reason for him to do so. Moreover,

12    although it is true that the terms of service alert would have been visible to Metter when he first

13    reached the payment and registration screen, it would have been obscured immediately when

14    Metter pressed any field asking for his credit card information. As these fields are at the top of the

15    screen, and entry of payment information is one of the primary purposes of this page, the Uber app

16    essentially prompts a user to enter his credit card information as soon as he reaches the payment

17    and registration screen. As a result, an ordinary registrant will often be compelled to activate the

18    pop-up keyboard and obscure the terms of service alert before having the time or wherewithal to

19    identify other features of the screen, including the alert. When such a registrant presses

20    "REGISTER" without having seen the alert, he does so without inquiry notice of Uber's terms of

21    service and without understanding that registering is a manifestation of assent to those terms.

22    Although the terms of service alert seems designed to put a registrant on inquiry notice of Uber's

23    terms of service and to alert the registrant that registration will amount to affirmative assent to

24    those terms, the keypad obstruction is a fatal defect to the alert's functioning. That defect turns

25    what would be a sufficient notice process, *see Cordas*, 2017 WL 658847, at \*2-4, into a deficient

26    one, *see Nguyen*, 763 F.3d at 1178-79 (holding no constructive notice where "a website makes its

27    terms of use available via a conspicuous hyperlink on every page of the website but otherwise

28

ORDER DENYING UBER'S MOTION TO COMPEL ARBITRATION
CASE NO. 16-cv-06652-RS

6

provides no notice to users nor prompts them to take any affirmative action to demonstrate assent"). In effect, the keypad obstruction turns Uber's terms of service alert into something resembling an unenforceable "browsewrap agreement" because a registrant can purportedly agree to Uber's terms of service without knowing he is doing so. *See id.* at 1176 ("[A] browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website.").

Given the functioning of the Uber app's registration process, and the reasonable doubts and inferences that must be drawn in Metter's favor, *see Three Valleys*, 925 F.2d at 1141, Metter's declaration that he never saw the terms of service alert is credible and consistent with the functioning of the Uber app. Accordingly, Metter has raised a genuine issue of fact concerning his notice of, and assent to, Uber's terms of service. It is therefore improper to conclude as a matter of law that Metter had actual notice of Uber's terms of service, or that he was on inquiry notice of the terms of service and affirmatively assented to them, and the motion to compel arbitration must be denied. *See Nguyen.*, 763 F.3d at 1173 (holding plaintiff did not assent to terms of service of which he did not have reasonable notice); *Three Valleys*, 925 F.2d at 1141 ("Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.").

This is not to say a litigant, like Metter, can defeat a motion to compel arbitration simply by claiming he never saw the terms of service alert. For instance, arbitration was proper in *Cordas*, where the plaintiff conclusorily claimed he never saw the terms of service alert, but did not affirmatively identify any particular reason he would not or could not have seen it. 2017 WL 658847, at *3 (citing *Three Valleys*, 925 F.2d at 1141) ("Cordas raises no genuine dispute of any material fact, and it is proper to conclude, as a matter of law, that he was on notice of Uber's terms and conditions, and assented to them in signing up for Uber."). But where, as here, the party opposing arbitration sufficiently alleges he had no notice of Uber's terms of service because the Uber app functionally prevented him from seeing the terms of service alert, he will have raised a

genuine dispute as to whether he received inquiry notice of and assented to those terms.[4] *See*

*Nguyen.*, 763 F.3d at 1179 ("[T]he onus must be on website owners to put users on notice of the

terms to which they wish to bind consumers. . . . [C]onsumers cannot be expected to ferret out

hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.").

In addition to arguing for the sufficiency of its terms of service alert, Uber argues Metter

cannot disclaim notice of and assent to Uber's terms and conditions because his complaint alleges

the existence of a contract, references Uber's terms of service, and brings a claim under California

Civil Code section 1671(d), which requires the existence of a contract. Although Uber is correct

that statements in a complaint amount to judicial admissions, *Am. Title Ins. Co. v. Lacelaw Corp.*,

861 F.2d 224, 226 (9th Cir. 1988), these additional arguments nonetheless fail because no

statements in Metter's complaint amount to an admission that he agreed to Uber's terms of

service. While Metter may believe he formed a contract with Uber by registering an account and

using Uber's services, nowhere has he admitted that the scope of that contract is defined by Uber's

terms of service agreement. Likewise, the fact that Metter brings a claim sounding in contract

does not mean Uber's terms of service are the purported contract. The complaint's references to

Uber's terms of service, meanwhile, prove only that Metter was aware of the terms of service at

the time he began litigating his case; those references prove nothing regarding Metter's awareness

---

[4] Unlike Cordas, Metter identifies specific features of the Uber app's functionality that explain why he allegedly never saw the terms of service alert: "[A] numbered keypad would have immediately appeared below the 'Register' button that then blocks the entire bottom portion of the screen. The blocked portion of the screen appears to include the [terms of service alert]. Because I would have clicked the top area of the screen to enter my credit card number . . . immediately upon encountering the 'Payment' screen rather than scrolling [down], and because I did not notice the [terms of service alert], the keypad to enter my credit card information would have obstructed my view of the entire screen below the 'Register' button. I do not recall viewing, and . . . was not required to view, the blocked portion of the screen in order to click the 'Register' button and complete the registration process." Metter Decl. ¶ 5. At the hearing on this motion, Uber challenged the sufficiency of Metter's allegations because his declaration refers to what he "would have" seen and done rather that what he *did* see and do. The significance of the distinction is not obvious in this context. For one, Uber acknowledges that the numbered keypad would have blocked the terms of service alert from view. Moreover, Metter does not have to state with perfect memory that he immediately clicked the credit card number field when he reached the payment screen in order to create a genuine dispute of fact. It is enough that, when presented now with the evidence of registration process he encountered in 2014, he is able to state how he would have used it at the time.

of the terms of service at the time he registered with Uber, used Uber services, or incurred the

disputed cancellation fees, nor do they prove Metter assented to the terms of service.

## V. CONCLUSION

For the foregoing reasons, Uber's motion to compel arbitration is denied.

**IT IS SO ORDERED**.

Dated: April 17, 2017

_____

RICHARD SEEBORG
United States District Judge

**APPENDIX**



Figure 1.

Figure 2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDER DENYING UBER'S MOTION TO COMPEL ARBITRATION
CASE NO. 16-cv-06652-RS

11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 3.

Figure 4.