1    WILLIAM L. STERN (BAR NO. 96105)
     WStern@mofo.com
2    LUCIA X. ROIBAL (BAR NO. 306721)
     LRoibal@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, CA  94105-2482
     Telephone:  415.268.7000
5    Facsimile:  415.268.7522

6    Attorneys for Defendant
     UBER TECHNOLOGIES, INC.
7

8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10

11   JULIAN METTER, individually and on behalf        Case No. 3:16-cv-06652-RS
     of a class of similarly situated individuals,
12                                                     **DEFENDANT'S TRIAL BRIEF**
                              Plaintiff,
13                                                     Date:  April 11, 2018
             v.                                        Time: 9:30 a.m.
14
                                                       Hon. Richard Seeborg, Courtroom 3
15   UBER TECHNOLOGIES, INC.,

16                            Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

I.     INTRODUCTION ................................................................................................... 1

II.    PROCEDURAL BACKGROUND ........................................................................ 2

III.   STATEMENT OF FACTS .................................................................................... 2

     A.    Mr. Metter's First Assent:  Clicking "REGISTER" on October 24, 2014.............. 2

     B.    Mr. Metter's Second Assent:  Using the Uber App on December 8, 2016. ........... 3

IV.   LEGAL STANDARD ............................................................................................ 4

V.    MR. METTER ASSENTED TWICE TO UBER'S TERMS OF SERVICE.................... 4

     A.    Mr. Metter Assented When He Registered to Use the Uber App. ......................... 4

          1.    The Inquiry Notice Legal Standard.............................................................. 4

          2.    Uber's Prima Facie Case of Assent............................................................. 6

          3.    Mr. Metter Fails to "Unequivocally Deny" His Assent. .............................. 6

     B.    Mr. Metter Assented by Using the App After the November 2016 Email. ........... 7

          1.    Mr. Metter Assented Pursuant to the "Continued Use" Doctrine. ............. 7

          2.    The Arbitration Agreement Applies to This Dispute. ................................. 8

          3.    That Mr. Metter's "Use" Came After Suit Was Filed Is Immaterial. ......... 9

VI.   CONCLUSION ..................................................................................................... 10

1    This proceeding is a mini-trial pursuant to 9 U.S.C. § 4: "If the making of the arbitration

2    agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall

3    proceed summarily to the trial thereof."

4    **I.    INTRODUCTION**

5    The question presented:  Did Plaintiff Julian Metter, who downloaded, registered for, and

6    uses the Uber App to find rides, assent to Uber's Terms of Service and the arbitration agreement

7    it contained?

8    The answer:  Mr. Metter assented to Uber's Terms of Service not once, but twice.

9    First, he assented on October 24, 2014, when he signed up to use the Uber App.  After

10   entering his name and biographical information, Mr. Metter arrived at the "Payment" screen,

11   where he was presented with a visible and conspicuous[1] Terms of Service alert with a hyperlink

12   to the Terms of Service.  The Second Circuit held on substantially similar facts that this

13   unobstructed alert provided reasonably conspicuous notice of Uber's Terms of Service as a matter

14   of California law.  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77-78 (2d Cir. 2017).

15   Mr. Metter disagrees, arguing that his smartphone's keypad blocked his view following

16   his decision to sign up for Uber by tapping a field on the payment screen to enter his credit card

17   information.  But this argument fails.  He was presented at the outset with an unobstructed alert.

18   That put him on inquiry notice.  Indeed, on remand from the Second Circuit's decision, Mr.

19   Meyer asserted the same "smartphone keypad" argument, but the district court nonetheless

20   granted defendants' motions to compel arbitration.  *Meyer v. Kalanick*, No. 15 Civ. 09796, 2018

21   WL 1166641 (S.D.N.Y. Mar. 5, 2018).

22   Mr. Metter has no credible response.  He testified he cannot "recall" seeing the alert.  But

23   not remembering is not enough.  He must prove he was not on inquiry notice.  He cannot.

24   Second, Mr. Metter assented to Uber's Terms of Service again, two years after he

25   registered to use the Uber App to find rides.  All registered users, including Mr. Metter, received

26   

27   [1] In its April 17, 2017 Order denying Uber's motion, the Court found that the alert was "sufficiently conspicuous to alert an Uber registrant that he is agreeing to Uber's terms of service." (ECF No. 39 at 5.)

28

1   an email in November 2016.  It alerted them to Uber's updated Terms of Service and *specifically*

2   *called out arbitration*:  "We revised our arbitration agreement which explains how legal disputes

3   are handled."  The email continues, "[i]f you use our app or other services on or after [November

4   16, 2016], you're confirming you've read and agree to the updated Terms."  Mr. Metter opened

5   this email six times.  On December 8, 2016, he used the Uber App to summon a ride.  He has

6   continued to use the Uber App to take rides up to and including March 21, 2018.

7       For all the foregoing reasons, this Court should find that Mr. Metter assented to Uber's

8   Terms of Service – including the arbitration agreement – first on October 24, 2014, and again on

9   December 8, 2016.

10  **II.    PROCEDURAL BACKGROUND**

11      On April 17, 2017, this Court denied Uber's motion to compel arbitration, finding that Mr.

12  Metter had raised a triable issue of fact on whether he had notice of, and thus assented to, Uber's

13  Terms of Service, including the arbitration agreement.   (ECF No. 39 at 7.)  On May 10, 2017, the

14  Court denied Uber's motion for reconsideration.  (ECF No. 43.)  Uber appealed.  (ECF No. 47.)

15  The district court also denied Uber's motion for a stay pending appeal, but noted that "Uber could

16  still move under FAA section 4 for a trial on the subject of Metter's consent to its terms of service

17  and arbitration agreement."  (ECF No. 57 at 5.)

18      On October 11, 2017, the Ninth Circuit granted limited remand to allow this Section 4

19  proceeding.  It instructed the parties to file a report on the status of district court proceedings

20  within seven days of this Court's ruling on this mini-trial.  *Metter v. Uber Techs., Inc.*, No. 17-

21  16027 (9th Cir. Oct. 11, 2017), Dkt. No. 21.

22  **III.   STATEMENT OF FACTS**

23      **A.    Mr. Metter's First Assent:  Clicking "REGISTER" on October 24, 2014.**[2]

24      The evidence will show that Mr. Metter registered to use Uber on October 24, 2014, using

25  a Samsung Galaxy S4 with an Android operating system.  The Terms of Service alert was

26  unobstructed, with the entire screen visible when Mr. Metter first arrived at the Payment screen.

27  _____

28      [2] These facts will be presented through the Pre-Filed Direct testimony of Tony Cosentini.

1  It remained visible prior to Mr. Metter choosing to register tapping on any of the fields on the

2  Payment screen, i.e., prior to engaging his smartphone's keypad.

3      Mr. Metter spent 55 seconds on the "Payment" screen.  During that time, he entered his

4  credit card number, expiration date, three-digit security code, and zip code.  During those 55

5  seconds, Mr. Metter may have seen an unblocked Terms of Service alert in a number of other

6  ways, beyond just his initial—and unobstructed—view of the Terms of Service alert.

7      **B.      Mr. Metter's Second Assent:  Using the Uber App on December 8, 2016.**[3]

8      Between November 14-21, 2016, Uber emailed all users who utilize the Uber App to seek

9  and arrange rides (hereinafter, "users" or "riders") in the United States to notify them of Uber's

10  updated Terms. (*See* Ex. 2 [hereinafter "the November 2016 email"].)  The November 2016 email

11  specifically noted that the updates "revise[] our arbitration agreement which explains how legal

12  disputes are handled."   The November 2016 email instructed riders to "read [the Terms of

13  Service] fully," and provided an embedded hyperlink to the Terms, explaining, "you can access

14  [the Terms] here."  (*Id.*)  Users were reminded that "[i]f you use our app or other services on or

15  after that date, you're confirming you've read and agree to the updated Terms."  (*Id.*)

16      The Terms of Service, accessible by the hyperlink in the November 2016 email, provided

17  that "You and Uber agree that any dispute, claim or controversy arising out of or relating to (a)

18  these Terms or the existence, breach, termination, enforcement, interpretation, or validity thereof,

19  or (b) your access to or use of the Services at any time, whether before or after the date you

20  agreed to the Terms, will be settled by binding arbitration . . . ."  (Ex. 4, § 2.)

21      This email was sent to Mr. Metter on November 16, 2016.  Based on Uber's records, Mr.

22  Metter opened the email six times.  On December 8, 2016, Mr. Metter agreed to those Terms by

23  using the Uber App to request a ride.  Since the November 2016 email, Mr. Metter has arranged

24  no fewer than 39 trips via the Uber App.[4]

25

26

27      [3] These facts will be presented through the Pre-Filed Direct testimony of Allison Garrett.

28      [4] Mr. Metter's last ride was on March 21, 2018.

1  **IV.    LEGAL STANDARD**

2  The Federal Arbitration Act ("FAA") reflects a liberal policy favoring arbitration, and

3  requires that arbitration agreements be rigorously enforced.  *See AT&T Mobility LLC v.*

4  *Concepcion*, 563 U.S. 333, 339 (2011); *see also Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137

5  S.Ct. 1421, 1428 (2017) (holding that the FAA applies both to "contract formation and contract

6  enforcement").  When a party seeks to invoke Section 4, the party "must make a prima facie

7  showing that an agreement to arbitrate exists before the burden shifts to the party opposing

8  arbitration to put the making of that agreement 'in issue.'"  *Blau v. AT & T Mobility*, No. C 11

9  00541 CRB, 2012 WL 10546, at \*3 (N.D. Cal. Jan. 3, 2012) (citation omitted).  "Once the burden

10  has shifted to plaintiffs, they must 'unequivocally deny' the agreement."  *Id.* (citation omitted).

11  To unequivocally deny his assent, Plaintiff "must [] produce some evidence to substantiate the

12  denial."  *Quiroz v. Cavalry SPV I, LLC*, 217 F. Supp. 3d 1130, 1135 n.7 (C.D. Cal. 2016).

13  **V.    MR. METTER ASSENTED TWICE TO UBER'S TERMS OF SERVICE**

14  The issue in this mini-trial is whether Mr. Metter assented to Uber's Terms of Service,

15  which contains an arbitration agreement.  The evidence will show the answer is yes.

16  **A.    Mr. Metter Assented When He Registered to Use the Uber App.**

17  **1.    The Inquiry Notice Legal Standard.**

18  For electronic consumer transactions, mutual assent requires "reasonable notice" of the

19  terms of service agreement based on either actual or constructive notice.  *See Nguyen v. Barnes &*

20  *Noble Inc.*, 763 F.3d 1171, 1173-77 (9th Cir. 2014).  Constructive notice occurs when the

21  consumer has inquiry notice of the terms of service—like a hyperlinked alert—and takes an

22  affirmative action to demonstrate assent to them.  *Id.* at 1176-79.  "[W]hen considering the

23  perspective of a reasonable smartphone user, [courts] need not presume that the user has never

24  before encountered an app or entered into a contract using a smartphone."  *Meyer*, 868 F.3d at 77.

25  Moreover, "a reasonably prudent smartphone user knows that text that is highlighted in blue and

26  underlined is hyperlinked to another webpage where additional information will be found."  *Id.* at

27  77-78; *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) (internet users

28

1  understand that the hyperlinked phrase "Terms of Use" prompts the consumer "to examine terms

2  of sale that are located somewhere else"); *accord In re Facebook Biometric Info. Privacy Litig.*,

3  185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (choice-of-law clause that was part of defendant's

4  online TOS held enforceable where plaintiffs "had to click a box separately affirming that they

5  had read and agreed to the Terms of Use").

6       Courts routinely enforce online agreements no different than Mr. Metter's.[5]

7       In *Meyer*, the Second Circuit, applying California law and analyzing an Uber rider

8  registration similar to the one before this Court,[6] concluded that plaintiff was on inquiry notice of

9  Uber's Terms of Service, including the arbitration agreement.  *Meyer*, 868 F.3d at 77-78.  As the

10  Second Circuit explained, when plaintiff arrived at the payment screen, "[t]he entire screen [wa]s

11  *visible at once*, and the user d[id] not need to scroll beyond what [wa]s *immediately visible* to find

12  the notice of the Terms of Service."  *Id.* at p. 78 (emphasis added).  The Second Circuit held "the

13  design of the screen and language used render the notice provided reasonable as a matter of

14  California law."

15       On remand, Plaintiff in *Meyer* argued (as here) that following his decision to register by

16  tapping a field on the payment screen, his smartphone's keypad would have popped up and

17  obscured Uber's Terms of Service hyperlink.  *Meyer*, 2018 WL 1166641, at *5.  Judge Rakoff

18  nonetheless granted Uber's motion to compel arbitration for two reasons.  *Id.* at *9.  Although

19  ────────────

20       [5] *See, e.g.*, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257 (10th Cir. 2012) (holding
    clickwrap assent enforceable in internet service contract where customers click on an "I
21  Acknowledge" button on the same web page that has a hyperlink to defendant's terms of service);
    *Cullinane v. Uber Techs., Inc.*, No. 14-14750-DPW, 2016 WL 3751652, at *1 (D. Mass. July 11,
22  2016) (enforcing agreement with hyperlink labeled "Terms of Service"); *Swift v. Zynga Game
    Network, Inc.*, 805 F. Supp. 2d 904, 907 (N.D. Cal. 2011) (user agreed to arbitration provision
    because she was told that, "By using YoVille, you also agree to the YoVille [blue hyperlink]
23  Terms of Service" and the user proceeded); *Small Justice LLC v. Xcentric Ventures LLC*, 99 F.
    Supp. 3d 190, 193 (D. Mass. 2015); *Starke v. Gilt Groupe, Inc.*, No. 13 Civ. 5497(LLS), 2014
24  WL 1652225, at *1 (S.D.N.Y. Apr. 24, 2014); *Crawford v. Beachbody, LLC*, No. 14cv1583-
    GPC(KSC), 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5, 2014); *5381 Partners LLC v.*
25  *Shareasale.com, Inc.*, No. 12-CV-4263 (JFB)(AKT), 2013 WL 5328324, at *1 (E.D.N.Y. Sept.
    23, 2013); *Fteja*, 841 F. Supp. 2d at 831; *Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL
26  1021823, at *3 (N.D. Ill. Mar. 26, 2012); *Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F.
    Supp. 2d 669, 673 (N.D. Ohio 2010); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 232 (S.D.N.Y.
27  2007).

        [6] Plaintiff in *Meyer* used a Samsung Galaxy S5 smartphone with an Android operating
28  system to register to use Uber's services.

1  finding Plaintiff waived the smartphone keypad issue, the court nonetheless addressed it and

2  found the Second Circuit's opinion dispositive: "[W]hether Uber's Terms of Service hyperlink

3  was reasonably conspicuous was the subject of extensive proceedings before this Court and the

4  Second Circuit Court of Appeals, and, as mentioned earlier, the Second Circuit concluded last

5  August that the notice provided by Uber was sufficient as a matter of law." *Id.* at 6 (citing *Meyer*,

6  868 F.3d at 76-80).

7  ### 2.   Uber's Prima Facie Case of Assent.

8  Here, as in *Meyer*, Plaintiff was presented with an unobstructed Terms of Service alert and

9  hyperlink when he first arrived at the Payment Screen.  The alert and hyperlink remained visible

10 for as long as Metter wanted to view it and until Mr. Metter made the decision to sign up for

11 Uber's services by tapping a field on the payment screen to enter his credit card information.

12 Under *Meyer*, this is sufficient to show assent.

13 Beyond seeing the initial Terms of Service alert, Mr. Metter also could have seen an

14 unblocked Terms of Service alert several additional times while on the Payment screen,

15 depending on how he navigated through these fields and depending on his own personalized

16 smartphone settings.  In fact, there are at least five ways the alert would have been visible.  (*See*

17 Cosentini Direct Exam. at 2:3-7.)

18 ### 3.   Mr. Metter Fails to "Unequivocally Deny" His Assent.

19 Plaintiff bears the burden of "unequivocally denying" his assent.  *Blau*, 2012 WL 10546,

20 at *3.  But all Mr. Metter says is that he "do[es] not recall," and "did not notice" the Terms of

21 Service alert.[7]  (ECF No. 29-2, ¶¶ 3, 5.)

22 Failure to recall is not sufficient to negate having been put on inquiry notice from the fact

23

---

24 [7] To the extent Mr. Metter argues that he did not read the Terms of Service alert, this argument fails as well.  *See, e.g., Holl v. UPS*, No. 16-cv-05856 HSG, 2017 U.S. Dist. LEXIS

25 153317, at *13-14 (N.D. Cal. Sept. 18, 2017) (party was on inquiry notice regardless of plaintiff's allegation that he had no memory of reading the terms); *Guadagno v. E* Trade Bank*, 592 F.

26 Supp. 2d 1263, 1271 (C.D. Cal. 2008) (party is bound by terms "regardless of whether he actually reads them"); *Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991, 999 (N.D. Cal. 2012) ("Mr. Martin

27 declares that he either was never given a copy of the folder jacket or was given it after he signed the rental agreement, but this representation is *immaterial* because the terms of an incorporated

28 document must only have been easily available to him; they need not have actually been provided.") (emphasis added).

that the Terms of Service alert was visible at the outset.  *See Loewen v. Lyft, Inc.*, No. 15-cv-01159 (EDL), 2015 WL 12780465, at *5 (N.D. Cal. June 12, 2015) (plaintiffs did not unequivocally deny assent where they provided no evidence regarding the conditions under which they did or did not agree to the applicable arbitration agreements or evidence that contradicted defendant's declaration about plaintiffs' assent to the terms of service).

As the court in *Blau* explained, "[i]f a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless."  *Blau*, 2012 WL 10546 at *4.  Thus, failure to recall seeing the Terms of Service alert "do[es] not rise to the level of unequivocal denials of having agreed to th[e] terms."  *Id.*; *see also Meyer*, 868 F.3d at 71, 80 (finding plaintiff was on inquiry notice regardless of his claim that he "d[id] not recall seeing . . . the hyperlink").

## B.    Mr. Metter Assented by Using the App After the November 2016 Email.

Mr. Metter again assented to Uber's Terms of Service on December 8, 2016, when he used the Uber App after receiving the November 2016 email.

### 1.    Mr. Metter Assented Pursuant to the "Continued Use" Doctrine.

Assent doesn't have to be express.  It can be manifest by conduct, and a common way of manifesting assent is by continuing to use a defendant's product or service after being notified of the new terms.[8]  *See* Cal. Civ. Code § 1589 ("[V]oluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.")  Courts regularly enforce agreements "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound."  *Nguyen*, 763 F.3d at 1177; *see also Fagerstrom v.*

---

[8] Continued use as a form of acceptance is common in bank account agreement cases. *See, e.g., Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1386 (1993) (party receiving benefits of insurance manifested intent to accept renewal of policy); *Marzocchi v. Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133-34 (C.D. Cal. 2011) (under California law, plaintiff that did not expressly assent to arbitrate any disputes with employer nonetheless bound by arbitration provision by accepting employment and declining to submit opt-out form); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. CV 11-6555 PSG (PLAx), 2012 WL 7683512, at *7 (C.D. Cal. Feb. 24, 2012) (plaintiff's use of credit card and failure to opt out after the terms bound him to a valid arbitration provision); *Herrington v. Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026, 1032 (S.D. Miss. 2000) ("[T]he plaintiffs accepted the terms of the arbitration agreement by continuing to utilize their accounts.").

1   *Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1069 (S.D. Cal. 2015) (same); *Cairo, Inc. v.*

2   *Crossmedia Servs., Inc.*, No. C 04-04825 JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005)

3   (enforcing terms of use where website included notice stating that "continuing past this page

4   and/or using this site" meant agreement to abide by terms of use).

5          The November 2016 email was sufficient to bind Mr. Metter to arbitration as of at least

6   December 8, 2016.  The email was sent to all riders who utilized Uber's services to take a ride,

7   including Mr. Metter.  The email notified Mr. Metter—two weeks before he filed this lawsuit—

8   that Uber was updating its Terms of Service to "revise[] our arbitration agreement which explains

9   how legal disputes are handled."  Riders were reminded, as provided in Uber's existing Terms of

10  Service, that "[i]f you use our app or other services on or after [November 16, 2016], you're

11  confirming you've read and agree to the updated Terms."  The email included a hyperlink to

12  Uber's Term of Service, specifying that "you can access them here," with the word "here" offset

13  in a blue color, linking the user to the Terms.  Uber's records show that Mr. Metter received the

14  November 2016 email and opened it *six times* on November 16, 2016.  On December 8, 2016,

15  Mr. Metter used the Uber App to take a trip.  Mr. Metter's continued use of the Uber App since at

16  least December 8, 2016, with his last ride on March 21, 2018, constitutes his manifest assent to

17  Uber's Terms and Conditions, including the arbitration agreement.

18                    **2.      The Arbitration Agreement Applies to This Dispute.**

19         Where an arbitration clause applies broadly to "any disputes," as here, courts apply the

20  clause retroactively to disputes that arose prior to the agreement.  *See DeVries v. Experian Info.*

21  *Solutions, Inc.*, No. 16-cv-02953-WHO, 2017 WL 733096, at *8 (N.D. Cal. Feb. 24, 2017)

22  (arbitration agreements apply retroactively where the agreement covers disputes arising out of

23  "any other services provided by or on behalf of [defendant]."); *In re Verisign, Inc., Derivative*

24  *Litig.*, 531 F. Supp. 2d 1173, 1223-24 (N.D. Cal. 2007) (arbitration agreement covering "[a]ny

25  dispute or claim arising out of or relating to" the agreement, the services provided thereunder, or

26  "any other services provided" applied to events that occurred prior to signing of the agreement);

27  *Trujillo v. Gomez*, No. 14cv02483 BTM BGS, 2015 WL 1757870, at *8 (S.D. Cal Apr. 17, 2015)

28

1   (broad delegation clause, which had no "temporal limitations and [was] not limited to claims

2   arising under the Agreement itself" applied retroactively); *Ekin v. Amazon Servs., LLC*, 84 F.

3   Supp. 3d 1172, 1178 (W.D. Wash. 2014) (arbitration agreements that contain broad "relating to

4   any dispute" language encompass both future and past disputes).[9]

5          The arbitration agreement in Uber's Terms of Service broadly applies to "any dispute,

6   claim or controversy arising out of or relating to (a) these Terms or the existence, breach,

7   termination, enforcement, interpretation or validity thereof, or (b) your access to or use of the

8   Services at any time, whether before or after the date you agreed to the Terms." (*See* Ex. 4.)  Like

9   *Trujillo*, Uber's arbitration agreement has no temporal limits, and even specifies that the

10  agreement applies to "use of the Services . . . ***whether before or after*** the date you agreed to the

11  Terms."  (*Id.* (emphasis added).)  And like *In re Verisign* and *DeVries*, Uber's arbitration

12  agreement specifies that it applies not only to claims arising out of the agreement, but also to

13  claims arising out of "use of the Services."  Because Mr. Metter's complaint stems directly from

14  the cancellation fee he incurred from his use of the Uber App, (see, e.g., ECF No. 1, ¶ 3) the

15  arbitration agreement Mr. Metter entered on December 8, 2016 covers Mr. Metter's claims in this

16  case.

17          **3.     That Mr. Metter's "Use" Came After Suit Was Filed Is Immaterial.**

18          Plaintiff may contend that his assent came after he filed suit, and is therefore invalid.  He

19  would be wrong.  In *Jones v. Waffle House, Inc.*, 866 F.3d 1257 (11th Cir. 2017), plaintiff applied

20  for a job at Waffle House in Florida, was not hired and, therefore, did not sign an employment

21  agreement with its attendant arbitration provision.  *Id.* at 1262-63.  He sued Waffle House, and

22  while the lawsuit was pending, plaintiff got hired by Waffle House in Missouri and, in connection

23  with his employment, signed an arbitration agreement   *Id.*  Waffle House moved to compel

24  arbitration, which the district court denied.  *Id.* at 1263.

25

26          [9] *See also, e.g.*, *Levin v. Alms & Assoc., Inc.*, 634 F.3d 260, 267-68 (4th Cir. 2011);
    *TradeComet.com, LLC v. Google, Inc.*, 435 F. App'x 31, 34-35 (2d Cir. 2011); *Kristian v.*
27  *Comcast Corp.*, 446 F.3d 25, 33 (1st Cir. 2006); *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513
    F.3d 646, 652 (6th Cir. 2008).
28

1    The Eleventh Circuit reversed, finding that the broad delegation provision applied to the

2 claims plaintiff brought prior to entering into the arbitration agreement. *Id.* at 1273. The court

3 also rejected plaintiff's argument that the arbitration agreement was part of an *ex parte*,

4 purposeful attempt to communicate with putative class members. *Id.* at 1272-73. Instead,

5 plaintiff "had the upper hand" because he had voluntarily applied for the job and signed the

6 agreement, and knew that he had a pending lawsuit against Waffle House. *Id.* at 1266. The court

7 thus reversed and remanded with instructions to compel arbitration. *Id.* at 1273.

8    This case presents stronger facts than *Jones*. First, Uber sent the November 2016 email

9 before Uber was served with the Complaint in this case. (ECF No. 6). Second, here, as in *Jones*,

10 Mr. Metter "had the upper hand." He used the Uber App on December 8, 2016 to seek and

11 arrange a trip of his own volition. The November 2016 email made clear that Mr. Metter's use of

12 the Uber App or other Uber services meant that Mr. Metter was "confirming [he had] read and

13 agree[d] to the updated Terms." Mr. Metter opened this email six times. There is no doubt that

14 Mr. Metter assented to Uber's Terms of Service, including the arbitration agreement, at least as of

15 December 8, 2016, when he used the Uber App to take a ride.

16 **VI.    CONCLUSION**

17    For the foregoing reasons, this Court should find that Mr. Metter manifested his assent to

18 Uber's Terms and arbitration provision on two separate occasions, each of which separately binds

19 Mr. Metter to arbitrate his claims.

20

21 Dated: April 4, 2018                    WILLIAM L. STERN
                                          LUCIA X. ROIBAL
22                                        MORRISON & FOERSTER LLP

23

24                                        By:    /s/ *William L. Stern*
                                                WILLIAM L. STERN
25
                                          Attorneys for Defendant
26                                        UBER TECHNOLOGIES, INC.

27

28