Mark A. Ozzello (CA SBN 116595)
Mark.Ozzello@capstonelawyers.com
Tarek H. Zohdy (CA SBN 247775)
Tarek.Zohdy@capstonelawyers.com
Cody R. Padgett (CA SBN 275553)
Cody.Padgett@capstonelawyers.com
Trisha K. Monesi (SBN 303512)
Trisha.Monesi@capstonelawyers.com
Capstone Law APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396

Attorneys for Plaintiffs Charlotte Epps-Stowers and Robert Verklas

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIAN METTER, CHARLOTTE EPPS-STOWERS and ROBERT VERKLAS, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br>v.<br><br>UBER TECHNOLOGIES, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:16-cv-06652-RS<br><br>**PLAINTIFFS' TRIAL BRIEF FOR BENCH TRIAL UNDER SECTION 4 OF THE FEDERAL ARBITRATION ACT**<br><br>Date: April 19, 2019<br>Time: 9:30 a.m.<br>Ctrm: 3<br><br>Judge: Hon. Richard Seeborg<br>Action Filed: November 16, 2016 |

## I. INTRODUCTION

On January 17, 2017, Defendant Uber Technologies, Inc. ("Defendant" or "Uber") filed a motion to compel arbitration based upon an arbitration clause contained in its Terms of Service and Privacy Agreement. Uber argues that the clause is accessible through a hyperlink on one of the screens that is presented to consumers during the registration process. Plaintiff Julian Metter ("Metter") opposed the motion on several grounds, including that he would not have seen the hyperlink during the registration process because when Plaintiff reached the payment screen and started entering his credit card information, a keypad popped up on the screen, blocking the hyperlink from his view. The Court agreed with Plaintiff and denied Uber's motion. Specifically, the Court explained:

> Uber never explains why Metter would have scrolled down to find a terms of service alert he was not otherwise aware of, especially when the registration and payment screen neither instructed him to scroll down nor presented any reason for him to do so. . . . When such a registrant presses "REGISTER" without having seen the alert, he does so without inquiry notice of Uber's terms of service and without understanding that registering is a manifestation of assent to those terms. . . . [T]he keypad obstruction is a fatal defect to the alert's functioning. That defect turns what would be a sufficient notice process . . . into a deficient one.

(Dkt. 39 at 7) (citations omitted).

Because Uber failed to show, as a matter of law, that Metter assented to its arbitration agreement, the Court set this matter for a mini-trial under 9 U.S.C. § 4.

Mr. Metter subsequently withdrew from this action, but was replaced by Plaintiffs Charlotte Epps-Stowers ("Epps-Stowers") and Robert Verklas ("Verklas"), together, "Plaintiffs." Uber has now moved to compel Plaintiffs to arbitration. Plaintiffs both registered with Uber using Samsung phones, as did Mr. Metter. The inclusion of these new plaintiffs has changed nothing. As with Mr. Metter, Uber again failed to show, as a matter of law, that Plaintiffs assented to its arbitration agreement, requiring this mini-trial under section 4.

To prevail, Uber must establish the elements of a contract under California law by a preponderance of the evidence. As discussed below, Uber cannot do so because, like Mr. Metter, Plaintiffs were never on inquiry notice of Uber's Terms of Service and did not manifest assent to those terms.

## II. ARGUMENT

### A. Uber Has the Burden of Establishing Assent to its Arbitration Agreement

Whether an arbitration clause is enforceable begins as a question of contract formation, which is controlled by state law. *Nguyen v. Barnes & Noble Inc.* 763 F.3d 1171, 1175 (9th Cir. 2014) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "Where a disputed arbitration agreement was allegedly executed in California, or the parties have otherwise agreed, the Court applies California's substantive law in determining its validity." *Perez v. Maid Brigade, Inc.*, 2007 WL 2990368 (N.D. Cal. Oct. 11, 2007) *citing Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1105 (9th Cir.2003). Under California law, Uber bears the burden of proving the existence of an arbitration agreement by the preponderance of the evidence. *Norcia v. Samsung Telecomms. America, LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017); *see also*, *Rosenthal v. Great W. Fin. Sec. Corp*., 14 Cal.4th 394, 413 (1996). "[T]he essential elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) '[a] lawful object;' and (4) '[s]ufficient cause or consideration.'" *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (alterations in original) (quoting Cal. Civ. Code § 1550). Thus, Uber has the burden here of proving Plaintiffs assent to Uber's arbitration agreement by a preponderance of the evidence.

California law requires "'clear and unmistakable evidence of an agreement' by the parties to arbitrate threshold issues." *Lee v. Postmates Inc*., 2018 WL 6605659 (N.D. Cal. Dec. 17, 2019) (citing *Mohamed v. Uber 848 F.3d at 1208)*; *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015) ("a court must enforce an agreement that…clearly and unmistakably delegates arbitrability questions to the arbitrator"). "When determining whether a contract to arbitrate was formed, the usual policy favoring arbitration does not apply." *Motley v. ContextLogic, Inc*., No. 3:18-cv-2117-JD, 2018 WL 5906079 at *1 (N.D. Cal. Nov. 9, 2018) (citation omitted); *see Goldman Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) ("If the parties contest the existence of an arbitration agreement, the presumption in favor of arbitrability does not apply.") Indeed, the presumption in favor of arbitration only applies *after* a court finds an "express agreement to arbitrate [that] was validly formed."); *Granite Rock Co.*

*v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 303 (2010).

Uber has not met its burden here because it cannot show that Plaintiffs had actual or constructive notice of an agreement to arbitrate and thus, there is no agreement.

**B. The Evidence Will Show Plaintiffs Never Formed an Agreement to Arbitrate With Uber**

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) (applying California law). Mutual assent is the key to contract formation in California. *Nguyen, supra,* at 1175; Cal. Civ. Code §1565. "Arbitration agreements are no exception to the requirement of manifestation of assent." *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law). When neither actual knowledge nor express consent to an electronic adhesion contract is present, as is the case here, courts look to whether "the website puts a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen, supra,* at 1177. Moreover, "[w]hether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage." *Id.* Critically, "proximity or conspicuousness of the hyperlink alone is not enough to give rise to constructive notice" *Id.* at 1178.

The evidence before this Court clearly shows that the design and content of Uber's registration process on its website and smartphone app, as encountered by Plaintiffs at the time of their respective registrations, could not *and did not* place Plaintiffs on inquiry notice of an agreement to arbitrate with Uber.

**1. The Android-Based Mobile App Did Not Place Plaintiffs on Inquiry Notice**

**a. Plaintiff Epps-Stowers**

The evidence, including Plaintiff Epps-Stowers' own testimony, will establish that she was never presented with, and never saw, a Terms of Service & Privacy Policy alert or hyperlink at any stage of the Uber registration process. Ms. Epps-Stowers registered for an Uber account via her Android-operated smartphone through the Uber mobile app. According to Uber's records, as provided in support of its most recent Motion to Compel Arbitration, Ms. Epps-Stowers

registered for her Uber account on April 23, 2014. Ms. Epps-Stowers does not dispute this fact. Ms. Epps-Stowers reviewed the Declarations of Naveen Narayanan that purport to depict "[t]rue and correct screenshots of the registration sign-up process" for the Android version of the Uber smartphone app in effect on March 1, 2014 and March 2, 2014. Ms. Epps-Stowers recalls being presented with substantially similar screens when she registered for Uber on the Uber app.

When Plaintiff Epps-Stowers went through the Uber registration process however, she was never presented with, and never saw, a hyperlink to the terms of service at the bottom of the payment screen. Notably, Exhibits 1 and 2 show that the one and only time Plaintiff Epps-Stowers *could have been* exposed to language concerning Uber's "Terms of Service & Privacy Policy" while registering was on the final "Link Payment" screen. Ms. Epps-Stowers' testimony establishes that a numeric keypad immediately popped up that covered the bottom half of her phone screen. Plaintiff immediately began to enter her payment information using the numeric keypad when the payment screen appeared. Plaintiff's testimony further establishes that she did not see the statement and purported hyperlink to the terms of service before the keypad arose and completely obstructed the hyperlink. Her testimony demonstrates that she never scrolled down the page while the keypad was engaged nor was she required to scroll to the bottom of the page in order to effectuate the registration. In fact, Plaintiffs' Exhibits 1 and 2 show that the keypad blocked the entire bottom half of the page, including the language regarding the terms of service. Courts, including this one, routinely find that displays such as those encountered by Ms. Epps-Stowers are simply not enough to place a consumer on inquiry notice. *See Nguyen*, 763 F.3d at 1173 ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement."); *Sprecht*, 306 F.3d at 23 (refusing to enforce terms of use that "would have become visible to plaintiffs only if they had scrolled down to the next screen"); *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 367 (E.D.N.Y. 2009) (no agreement to arbitrate where plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen—an action that was not required to effectuate her purchase"); *Rushing v. Viacom Inc.*, No. 17-cv-4492-JD, 2018 WL 4998139 *2 (N.D. Cal. Oct. 15, 2018) (finding no

constructive notice of mobile app's arbitration agreement where the reference to the agreement "was not visible to users unless they clicked on 'more,' and critically, there was no need for users to click on the 'more' button in order to start downloading the game.")

Plaintiff Epps-Stowers' testimony demonstrates that she did not know, and had no reason to know, there was any information under the keypad. In addition, Plaintiff never saw the bottom of the payment screen and keypad simultaneously. Indeed, her testimony shows that she never saw the bottom of the screen at all, and the keypad remained engaged until she clicked the "Save" button on the top of the screen and the payment screen was no longer visible. Her testimony reveals that she immediately entered her credit card information and then selected the "Save" button, located at the very top of the screen, which provided no indication to Plaintiff that she was agreeing to any terms with Uber. Plaintiff did not adjust any settings on her phone that would affect the appearance and functioning of the Uber application. She also did not disable the keypad feature on her phone nor did she connect a physical keyboard to her phone via Bluetooth.

Plaintiff expects Uber will argue that, if Plaintiff Epps-Stowers did sign up via the mobile Uber app, she saw the hyperlink before the keypad arose or Uber will claim that Plaintiff somehow disengaged the keypad or adjusted settings so that she could see both the hyperlink and the keypad simultaneously. However, Plaintiff's testimony forecloses both arguments, demonstrating that she never saw the hyperlink to the terms of service, let alone that she ever saw it simultaneously with the keypad displayed. Instead, the evidence will establish that when the keypad popped up, the supposed hyperlink was blocked and would require Ms. Epps-Stowers to scroll to the bottom of the page, which she did not do, and was not required to do, to complete her registration.

Moreover, the design and display of the obscured language further precludes a finding of inquiry notice for several reasons: (1) there is no differentiation in text color for the hyperlink at the bottom of the page; (2) the "save" button is at the very top of the page and nowhere near the hyperlink; and (3) the "save" button provides no indication that the user is completing the registration process or assenting to any agreement with Uber. *See McKee v. Audible, Inc.*, 2017 WL 4685039 (C.D. Cal. July 17, 2017) (no manifestation of assent in registration process where

"the disclosure appears in small, undifferentiated text"); *Pollstar v. Gigmania, Ltd.*, 170 F.Supp.2d 974, 981 (E.D.Cal. 2000) (refusing to enforce browsewrap agreement where textual notice appeared in small gray print against a gray background).

As Plaintiff never had actual or constructive notice of Uber's terms of service hyperlink containing the arbitration agreement, she never expressly and unequivocally agreed to arbitrate and Uber has failed to meet its burden.

**b. Plaintiff Verklas**

Similarly, the evidence, including Plaintiff Verklas's own testimony, will establish that he was never presented with, and never saw, a Terms of Service & Privacy Policy alert or hyperlink at any stage of the Uber registration process. Thus, Plaintiff Verklas also never assented to any agreement to arbitrate with Uber and no such agreement was formed.

To the best of his recollection, Mr. Verklas registered for an Uber account via his Android-operated smartphone through the Uber mobile app in early 2014 but no later than October 2014. Mr. Verklas confirmed his recollection by reviewing his bank statements from 2014 that clearly evidence charges from Uber during that time. Mr. Verklas reviewed the Declarations of Naveen Narayanan that purport to depict "[t]rue and correct screenshots of the registration sign-up process" for the Android version of the Uber smartphone app in effect on March 1, 2014 and March 2, 2014. Mr. Verklas recalls being presented with substantially similar screens when he registered for Uber on the Uber app. When Plaintiff Verklas went through the Uber registration process however, he was never presented with, and never saw, a hyperlink to the terms of service at the bottom of the payment screen. His testimony is that a keypad popped up that covered the bottom half of his phone screen to allow Plaintiff to enter his credit card information. Mr. Verklas immediately began to enter his credit card information on the payment screen when the payment screen appeared. Plaintiff's testimony states that he did not see the statement and hyperlink to the terms of service before the keypad arose and when it did it completely obstructed any purported hyperlink. His testimony further demonstrates that he never scrolled down the page while the keypad was engaged. Plaintiffs' Exhibits 1 and 2 show that the keypad blocked the entire bottom half of the page, including the language regarding the terms of service. Plaintiff Verklas'

testimony demonstrates that he did not know, and had no reason to know, there was any information under the keypad. Plaintiff never saw the bottom of the payment screen and keypad simultaneously. Indeed, his testimony shows that he never saw the bottom of the screen at all, and the keypad remained engaged until he clicked the "Save" button on the top of the screen and at that time the payment screen was no longer visible. His testimony reveals that he immediately entered his credit card information and then selected the "Save" button, located at the very top of the screen. Nothing provided any indication to Plaintiff that he was agreeing to any terms with Uber. Plaintiff did not adjust any settings on his phone that would affect the appearance and functioning of the Uber application. He also did not disable the keypad feature on his phone nor did he connect a physical keyboard to his phone via Bluetooth.

Plaintiff expects Uber will again argue that Mr. Verklas saw the hyperlink before the keypad arose or claim that Plaintiff somehow disengaged the keypad or adjusted settings so that he could see both the hyperlink and the keypad simultaneously. However, Plaintiff's testimony forecloses both arguments, demonstrating that he never saw the hyperlink to the terms of service, let alone that he ever saw it simultaneously with the keypad displayed. Instead, the evidence will establish that when the payment screen appeared, Mr. Verklas immediately clicked on the space to enter his credit card information and the keypad popped up, blocking the supposed hyperlink at the bottom of the screen. As Plaintiff never had actual or constructive notice of Uber's terms of service hyperlink containing the arbitration agreement, he never expressly and unequivocally agreed to arbitrate.

Even if Mr. Verklas registered for Uber on December 25, 2015, as Uber contends, which he did not, his testimony evidences that he did not register by linking his Facebook account. Rather, Mr. Verklas would have proceeded through the registration process as previously stated, by entering his credit card information immediately upon reaching the payment screen and clicking "Save." Based on the Declaration of Tony Cosentini submitted earlier in this case, the registration process on or around December 25, 2015, would have been substantially similar, including the fact that the bottom half of the payment page is blocked by the keypad. (Exhibit 6). Thus, even if the Court finds that Uber has sufficiently proven that Mr. Verklas registered for

Uber on December 25, 2015, Uber still cannot prove by a preponderance of the evidence that Mr. Verklas assented to an arbitration agreement because he never saw, and had no reason to see, the bottom half of the payment screen. Moreover, Mr. Verklas' same bank account connected to his Uber account from that time period shows that Mr. Verklas never used Uber on or even near December 25, 2015 and would have had no reason to re-register on that date. (Exhibit 8).

**2. Uber's Website Does Not Place Users on Inquiry Notice**

Additionally, the evidence shows that Uber's website, which can be accessed via a desktop computer or a mobile device, would not have placed users on inquiry notice in or around April 2014. Specifically, if Ms. Epps-Stowers registered for Uber through the web browser on her phone or through the web browser on a computer, as Uber contends, Uber still cannot show that she was on constructive notice of the agreement to arbitrate.

First, the evidence shows that, at the time of Ms. Epps-Stowers' registration, Uber's mobile website provides no text or hyperlinks regarding Uber's Terms of Service. (Exhibit 9). The only words that appear on the home screen, m.uber.com, are two teal boxes at the top of the screen stating "LOG IN" and "REGISTER." Upon selecting the "REGISTER" button, users are taken to a screen that requests the users' first and last name, email address, Country, mobile phone number, password, and credit card information. There is no reference to the Terms of Service or language suggesting that, by registering for an Uber account, users agree to Uber's Terms of Service. Once users complete the information requested and select the "REGISTER" button at the bottom of the screen, the registration process is complete. Thus, the mobile website could not have put users on constructive or actual notice of Uber's Terms of Service at the time Ms. Epps-Stowers registered for an Uber account.

Second, the evidence shows that Uber's website, if accessed through the web browser on a computer at the time of Ms. Epps-Stowers' registration, similarly did not provide the requisite notice to users. Once a user clicks on the "GET STARTED" button located near the top of Uber's homepage, get.uber.com, users are taken to a second screen titled "SIGN UP." (Exhibit 11). The "SIGN UP" page has several empty boxes where users are required to enter their personal information including first and last name, mobile Country, mobile phone number, email address,

password, language, credit card information, and promotion code. (Exhibit 12). Below the boxes, there is tiny text stating, "By Clicking 'Sign Up' below, you are agreeing to the Uber Terms and Conditions and Privacy Policy." Below that text, there is a large teal box that states, "SUBMIT." Once a user selected the SUBMIT button, the registration process is complete. As the Second Circuit held in *Specht*, "conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers" is "essential if electronic bargaining is to have integrity and credibility." *Specht*, 306 F.3d at 35 (applying California law). Indeed, in cases where courts have relied on the proximity of the hyperlink to enforce a browsewrap agreement, the websites at issue have also included something more to capture the user's attention and secure her assent. *See, e.g., Nguyen*, *supra*, at 1178-79 ("where a website makes its terms of use available via a conspicuous hyperlink on every page of the website but otherwise provides no notice to users nor prompts them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink to relevant buttons users must click on—without more— is insufficient to give rise to [inquiry] notice"); *Zaltz v. JDATE*, 952 F.Supp.2d 439, 451–52 (E.D.N.Y. July 8, 2013) (users required to check box confirming that they had reviewed and agreed to website's Terms and Conditions, even though hyperlink to Terms and Conditions was located on the same screen as the button users had to click on to complete registration). Here, Uber's text and hyperlink to its Terms and Conditions are inconspicuous and do not require users to take any affirmative action indicating agreement to the Terms. Moreover, users have no option to click "Sign Up," as indicated in the text above the "SUBMIT" button. Therefore, there is no agreement to arbitrate between users, including Ms. Epps-Stowers, and Uber.

**3. The November 2016 Email Did Not Place Plaintiffs on Inquiry Notice**

Lastly, the evidence will show that Plaintiffs never received or had notice of Uber's revised Terms of Service in November 2016. Plaintiffs both conducted thorough searches of their email history and have no record of a November 2016 email from Uber. Further, Plaintiffs testimony shows that they never saw or opened an email from Uber regarding updates to Uber's Terms of Service. There is no legal support for the proposition that merely sending an email, with no evidence of receipt and which the recipient was not required to open or read, put

Plaintiffs on actual or inquiry notice of Uber's Terms, to which they have never assented. Further, this case was filed prior to November 2016 and thus, the email could not have provided notice to Plaintiffs of an agreement to arbitrate.

## III. CONCLUSION

The evidence will show that, as a matter of fact, Plaintiffs did not consent to the arbitration agreement in Uber's terms of service. Under the Federal Arbitration Act, if this Court finds that Plaintiffs never consented to arbitrate their claims, and therefore that no agreement for arbitration between Plaintiffs and Uber ever formed, the proceeding shall be dismissed. 9 U.S.C. § 4. For the foregoing reasons, the Court should dismiss this proceeding.

Dated: April 15, 2019

Respectfully submitted,

Capstone Law APC

By: /s/ Mark Ozzello

Mark Ozzello
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi

Attorneys for Plaintiffs