1  TIFFANY CHEUNG (BAR NO. 211497)
   TCheung@mofo.com
2  CLAUDIA M. VETESI (BAR NO. 233485)
   CVetesi@mofo.com
3  LUCIA X. ROIBAL (BAR NO. 306721)
   LRoibal@mofo.com
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, CA  94105-2482
   Telephone:  415.268.7000
6  Facsimile:  415.268.7522

7  Attorneys for Defendant
   UBER TECHNOLOGIES, INC.
8

9                UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11

12 | JULIAN METTER, CHARLOTTE EPPS-STOWERS, and ROBERT VERKLAS, individually and on behalf of a class of similarly situated individuals, | Case No. 3:16-cv-06652-RS |
   | --- | --- |
   | | **DEFENDANT'S TRIAL BRIEF** |
   | Plaintiff, | Date:   April 19, 2019 |
   | v. | Time:   9:30 a.m. |
   | | Ctrm:   3, Hon. Richard Seeborg |
   | UBER TECHNOLOGIES, INC., | Action filed:  November 16, 2016 |
   | Defendant. | |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................................. iii

I. INTRODUCTION ................................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................................ 2

    A. Mr. Verklas Assented to Uber's Terms When He Registered to Use the Uber App. ................................................................................................................... 2

    B. Ms. Epps-Stowers Assented to Uber's Terms at Registration. ................................ 2

    C. Plaintiffs' Each Assented Again By Using the Uber App After Receiving the November 2016 Updated Terms. ........................................................................ 3

III. LEGAL STANDARD ............................................................................................................ 3

IV. ARGUMENT ......................................................................................................................... 4

    A. Plaintiffs Assented to the Terms and Conditions When They Registered to Use the Uber App .......................................................................................................... 4

        1. Ms. Epps-Stowers Assented to Uber's Terms and Conditions When She Registered for an Uber Account. ............................................................. 6

        2. Mr. Verklas Assented When He Registered to Use the Uber App ............. 8

        3. Plaintiffs Again Assented by Continuing to Use the Uber App After Receiving a November 2016 Email Notice of Updated Terms................... 9

V. CONCLUSION ................................................................................................................... 12

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*5381 Partners LLC v. Shareasale.com, Inc.*,
   No. 12-CV-4263 (JFB)(AKT), 2013 WL 5328324 (E.D.N.Y. Sept. 23, 2013) .........................5

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ...............................................................................................................4

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
   207 F.3d 1126 (9th Cir. 2000) ................................................................................................4

*Cordas v. Uber Techs., Inc.*,
   228 F. Supp. 3d 985 (N.D. Cal. 2017) ................................................................................8, 9

*Crawford v. Beachbody, LLC*,
   No. 14cv1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ..............................5

*Davis v. Nordstrom, Inc.*,
   755 F.3d 1089 (9th Cir. 2014) ..............................................................................................10

*Druyan v. Jagger*,
   508 F. Supp. 2d 228 (S.D.N.Y. 2007) .....................................................................................5

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ...............................................................................................................9

*Fteja v. Facebook, Inc.*,
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) .....................................................................................5

*Golden Eagle Ins. Co. v. Foremost Ins. Co.*,
   20 Cal. App. 4th 1372 (1993) ...............................................................................................10

*Grant v. Morgan Stanley Smith Barney LLC*,
   No. 16-81924-CIV-MARRA, 2017 WL 1044484 (S.D. Fla. Mar. 20, 2017) ........................12

*Guerrero v. Equifax Credit Info. Servs., Inc.*,
   No. CV 11-6555 PSG, 2012 WL 7683512 (C.D. Cal. Feb. 24, 2012) ..................................10

*Hancock v. Am. Tel. & Tel. Co.*,
   701 F.3d 1248 (10th Cir. 2012) ..............................................................................................5

*Herrington v. Union Planters Bank, N.A.*,
   113 F. Supp. 2d 1026 (S.D. Miss. 2000) ..............................................................................10

*In re Facebook Biometric Info. Privacy Litig.*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) ............................................................................5, 10

*Izzi v. Mesquite Country Club*,
   186 Cal. App. 3d 1309 (1986) .................................................................................................. 12

*Johnson v. Uber Techs., Inc.*,
   No. 1:16-cv-05468, 2018 WL 4503938 (N.D. Ill. Sept. 20, 2018) ..................................... 5, 6, 9

*Kliff v. Hewlett Packard Co.*,
   318 F. App'x 472 (9th Cir. 2008) ............................................................................................ 12

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ........................................................................................... 4, 5, 6, 12

*Mortensen v. Bresnan Commc'ns LLC*,
   722 F.3d 1151 (9th Cir. 2013) ................................................................................................... 4

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir, 2014) ............................................................................................. 4, 10

*O'Connor v. Uber Techs., Inc.*, 150 F. Supp. 3d 1095 (N.D. Cal. 2015),
   *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018) ........................................................... 11

*Quevedo v. Macy's, Inc.*,
   798 F. Supp. 2d 1122 (C.D. Cal. 2011) ................................................................................... 10

*Rezaeian v. Starbucks Corp.*,
   No. LA CV16-04599 JAK (ASx), 2017 U.S. Dist. LEXIS 102677
   (C.D. Cal. Feb. 8, 2017) .......................................................................................................... 12

*Sherman v. AT&T Inc.*,
   No. 11 C 5857, 2012 WL 1021823 (N.D. Ill. Mar. 26, 2012) ................................................... 5

*Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*,
   708 F. Supp. 2d 669 (N.D. Ohio 2010) ..................................................................................... 5

*Starke v. Gilt Groupe, Inc.*,
   No. 13 Civ. 5497(LLS), 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) .................................... 5

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ....................................................................................... 5

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
   857 F. Supp. 2d 1135 (D. Colo. 2012) .................................................................................... 12

*Webber v. Uber Techs.*,
   No. 2:18-cv-02941-PSG-GJS (C.D. Cal. Sept. 5, 2018), ECF No. 58 ................................. 9, 10

*West v. Uber Techs.*,
   No. 2:18-cv-3001-PSG-GJS, 2018 WL 5937253 (C.D. Cal. Sept. 5, 2018) ........................ 9, 10

**Statutes**

9 U.S.C. § 2 ..........................................................................................................................4

## I. INTRODUCTION

Plaintiffs Charlotte Epps-Stowers and Robert Verklas cannot avoid their binding agreements to arbitrate their claims against Uber by claiming they did not see or read the Terms of Service they were presented with on multiple occasions. Both Plaintiffs admit that they registered for Uber rider accounts and thereafter reaped the benefits by using the Uber App to take rides. When they registered, both Plaintiffs had reasonable notice that if they chose to create an Uber account, they were agreeing to Uber's Terms and Conditions, including the Arbitration Agreement. After receiving such notice, both Plaintiffs decided to complete the registration process. Then after they registered, and before they incurred the alleged fees at issue, Uber again provided notice of their agreements to arbitrate through an email sent directly to both Plaintiffs. Plaintiffs' assent to Uber's Terms and Conditions on multiple occasions requires that their claims be compelled to arbitration.

*First*, both Plaintiffs assented when they registered for their Uber accounts. Mr. Verklas assented when he registered for an Uber account via the Uber App on October 12, 2014, and again on December 25, 2015. During his October 12, 2014 registration, Mr. Verklas encountered the unobscured Terms of Service alert *twice*. Then, during his most recent 2015 registration, Mr. Verklas was presented with the unobscured Terms of Service alert and hyperlink *again*. The alert would have been visible even after he engaged his Android device's keypad to enter his password—without scrolling—and would have remained visible until he clicked "NEXT" to register. Ms. Epps-Stowers assented on April 23, 2014, when she registered for an Uber account via a desktop on the get.uber.com website. There, an unobscured Terms of Service alert and hyperlink were presented to her. Even if she had registered through m.uber.com (she did not), she would have seen an unobscured Terms of Service alert and hyperlink using that "mobile" website as well.

*Second*, Plaintiffs assented when they used the Uber App to take trips following receipt of an email from Uber in November 2016. The email was sent to all riders to notify them of Uber's updated terms of service. The email specifically called out arbitration and instructed riders to "read [the Terms of Service] fully." It provided a colored hyperlink to the Terms, explaining,

"you can access [the Terms] here." Uber reminded riders that "[i]f you use our app or other services on or after that date, you're confirming you've read **and agree to the updated Terms**." Both Plaintiffs received the email. Since then, Mr. Verklas has taken 28 trips, and Ms. Epps-Stowers has taken 317 trips, via the Uber App. Plaintiffs both assented to the updated Terms.

Ms. Epps-Stowers and Mr. Verklas assented to Uber's Terms and Conditions—including the arbitration agreement—on multiple occasions. Plaintiffs must abide by their arbitration agreements, and this Court should dismiss or stay this action pending the outcome of arbitration.

## II.   FACTUAL BACKGROUND

### A.   Mr. Verklas Assented to Uber's Terms When He Registered to Use the Uber App.

Mr. Verklas agreed to Uber's Terms and Conditions and Arbitration Agreement when he registered to use the Uber App on December 25, 2015. The Terms of Service alert was unobstructed, with the entire screen visible when Mr. Verklas first arrived at the "Register" screen. After Mr. Verklas began to enter his password, the Terms of Service alert would have remained visible—even after he engaged his Android device's keypad, and without scrolling—and would have remained visible until he clicked "NEXT" to register.

After this Court's March 4, 2019 Order (ECF No. 116), Plaintiff's counsel provided Uber with another email address and telephone number for Mr. Verklas that was *different* from the information counsel had previously provided in July 2018. Using this new information, Uber confirmed that Mr. Verklas actually has two separate Uber accounts because he previously registered with a *different* email address and telephone number on October 12, 2014. When Mr. Verklas registered in 2014, he would have seen the unobscured Terms of Service alert and hyperlink *twice*. [1]

### B.   Ms. Epps-Stowers Assented to Uber's Terms at Registration.

Ms. Epps-Stowers registered for an Uber account by accessing the website get.uber.com using a *desktop*, not her mobile phone. During registration, she would have seen an unobscured

---

[1] In his declaration, Mr. Verklas claims that he did not register for Uber using his Facebook account, and does not recall that being an option when he registered. (Verklas Decl. ¶ 4.) But Uber's records show that he registered using his Facebook account on October 12, 2014.

1   Terms of Service alert.  When Ms. Epps-Stowers clicked to sign up, she assented to Uber's Terms
2   of Service and Arbitration Agreement.  Contrary to Ms. Epps-Stowers's claim that she registered
3   via her mobile phone through m.uber.com, Uber's records show otherwise.

4   But even if Ms. Epps-Stowers had signed up via m.uber.com (instead of get.uber.com),
5   she still would have seen an unobscured Terms of Service alert and hyperlink.  The January 22,
6   2014 screenshot of m.uber.com attached to Plaintiffs' counsel declaration does not show what the
7   website looked like on the date Ms. Epps-Stowers registered.  Indeed, Uber's records show that
8   on April 23, 2014, the m.uber.com website also included an unobscured Terms of Service alert.

      C.      **Plaintiffs' Each Assented Again By Using the Uber App After Receiving the November 2016 Updated Terms.**

11  In November 2016, Uber emailed all riders and notified them of Uber's updated Terms.
12  The subject of the email read: "We've Updated Our Terms of Use."  The November 2016 email
13  specifically told riders that the updates "revise[] our arbitration agreement which explains how
14  legal disputes are handled."  It instructed riders to "read [the Terms of Service] fully," and
15  provided an easily-accessible colored hyperlink to the Terms, explaining, "you can access [the
16  Terms] here."  Uber alerted riders that ***"[i]f you use our app or other services on or after that
17  date***, you're confirming you've read and agree to the updated Terms."  (emphasis added).

18  Uber sent the email to Ms. Epps-Stowers on November 16, 2016.  On December 14, 2016,
19  Ms. Epps-Stowers agreed to those Terms by using the Uber App to take a trip.[2]  Uber sent Mr.
20  Verklas the email on November 19, 2016.  On March 19, 2017, Mr. Verklas agreed to those
21  Terms by using the Uber App to take a trip.[3]

22  **III.    LEGAL STANDARD**

23  The Federal Arbitration Act ("FAA") reflects a liberal federal policy favoring arbitration,

---

[2] Ms. Epps-Stowers entered into the May 2013 Terms and Conditions and also the November 2016 Terms and Conditions.  The relevant provisions of the Agreements, including the Arbitration Provision, are substantially similar.

[3] Mr. Verklas entered into the April 2015 Terms and Conditions when he registered on December 25, 2015, the May 2014 Terms and Conditions when he registered on October 12, 2014 and also the November 2016 Terms and Conditions.  Again, the relevant provisions of the Agreements, including the Arbitration Provision, are substantially similar.

and requires that arbitration agreements be rigorously enforced. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("courts must place arbitration agreements on an equal footing with other contracts"). "[T]he FAA's purpose is to give preference (instead of mere equality) to arbitration provisions." *Mortensen v. Bresnan Commc'ns LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) (citing *Concepcion*, 563 U.S. at 344). "As arbitration is favored, those parties challenging the enforceability of an arbitration agreement bear the burden of proving that the provision is unenforceable." *Id.* at 1157 (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000)).

Contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A court must compel arbitration if the transaction involves interstate commerce and (1) a written arbitration agreement exists; and (2) the agreement encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

### IV.    ARGUMENT

#### A.    Plaintiffs Assented to the Terms and Conditions When They Registered to Use the Uber App

For electronic consumer transactions, mutual assent requires only "reasonable notice" of the terms of the agreement. *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1173-79 (9th Cir, 2014). Reasonable constructive notice occurs when the consumer has inquiry notice of the terms of service—like a hyperlinked alert—and takes an affirmative action to demonstrate assent to them. *Id.* at 1176-79. "[W]hen considering the perspective of a reasonable smartphone user, [courts] need not presume that the user has never before encountered an app or entered into a contract using a smartphone." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017). "Moreover, a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Id.* at 77-78; *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) (internet users understand that the hyperlinked phrase "Terms of Use" prompts the consumer "to examine terms of sale that are located somewhere else"); *accord In re Facebook Biometric Info. Privacy Litig.*,

185 F. Supp. 3d 1155, 1166 (N.D. Cal. 2016) (choice-of-law clause that was part of defendant's online TOS held enforceable).  Numerous courts addressing the enforceability of similar internet agreements have reached the same conclusion.[4]

In *Meyer*, the Second Circuit applied California law and analyzed a rider-side registration process similar to Mr. Verklas's[5] and concluded that plaintiff was on inquiry notice of Uber's Terms of Service, including the arbitration agreement.  *Meyer*, 868 F.3d at 77-78.  When plaintiff arrived at the payment screen, "[t]he entire screen [wa]s *visible at once*, and the user d[id] not need to scroll beyond what [wa]s *immediately visible* to find the notice of the Terms of Service." *Id.* at 78 (emphasis added).  The Second Circuit held "the design of the screen and language used render the notice provided reasonable as a matter of California law."  *Id.*

Similarly, in *Johnson v. Uber*, the court analyzed a similar rider sign-up process on plaintiff's Android-operated mobile device and determined that plaintiff had reasonable notice of Uber's Terms and Conditions.  *Johnson v. Uber Techs., Inc.*, No. 1:16-cv-05468, 2018 WL 4503938, at *4-5 (N.D. Ill. Sept. 20, 2018).  In *Johnson*, plaintiff was directed to a "Link Card" screen, which contained a warning that "[b]y creating an Uber account, you agree to the Terms of Service & Privacy Policy."  *Id.* at *1, *4.  The statement was colored white against a navy background, in an easy-to-read font, and the words "Terms of Service & Privacy Policy" were underlined to indicate a hyperlink that, when clicked, brought the user to a screen displaying Uber's Terms.  *Id.*  The *Johnson* court found the reasoning in *Meyer* persuasive, where the *Meyer*

---

[4] *See, e.g.*, *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1257-58 (10th Cir. 2012) (holding clickwrap assent enforceable in internet service contract where customers click on an "I Acknowledge" button on the same web page that has a hyperlink to defendant's terms of service); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 907-08 (N.D. Cal. 2011) (user agreed to arbitration provision because she was told that "[b]y using YoVille, you also agree to the YoVille [blue hyperlink] Terms of Service" and the user proceeded); *Starke v. Gilt Groupe, Inc.*, No. 13 Civ. 5497(LLS), 2014 WL 1652225, at *1 (S.D.N.Y. Apr. 24, 2014); *Crawford v. Beachbody, LLC*, No. 14cv1583-GPC(KSC), 2014 WL 6606563, at *1 (S.D. Cal. Nov. 5, 2014); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-CV-4263 (JFB)(AKT), 2013 WL 5328324, at *1 (E.D.N.Y. Sept. 23, 2013); *Fteja*, 841 F. Supp. 2d at 831; 834-35; *Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL 1021823, at *3 (N.D. Ill. Mar. 26, 2012); *Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 673 (N.D. Ohio 2010); *Druyan v. Jagger*, 508 F. Supp. 2d 228, 232 (S.D.N.Y. 2007).

[5] Like Mr. Verklas, the *Meyer* plaintiff registered with a phone using an Android operating system.

court concluded that "the Payment screen provided clear notice that there were terms that governed." *Id.* at *5 (quoting *Meyer*, 868 F.3d at 79-80). As in *Meyer,* the *Johnson* court held that "the 'Link Card' screen expressly warned that, by creating an account, the user was agreeing to be bound to the Terms[.]" *Id.* The same result is warranted here.

### 1. Ms. Epps-Stowers Assented to Uber's Terms and Conditions When She Registered for an Uber Account.

Here, as in *Meyer* and *Johnson*, Ms. Epps-Stowers was presented with an unobscured Terms of Service alert and hyperlink when she registered to use the Uber App on April 23, 2014. When Ms. Epps-Stowers clicked to sign up, she assented to Uber's Terms of Service and Arbitration Agreement.[6]

Ms. Epps-Stowers claims that to "the best of [her] recollection, [she] registered via the Uber mobile app." (Epps-Stowers Decl. ¶ 3.) Now faced with Uber's insurmountable evidence of assent, she also asserts that if it wasn't via the Uber mobile app, then it would have been via her smartphone's mobile web browser. (*Id.*) Ms. Epps-Stowers, however, doesn't say what that website would have been. Nor could she, since she asserts that she doesn't recall signing up via a website.

Instead, Ms. Epps-Stowers's counsel submitted exhibits of a screenshot of the website m.uber.com from January 22, 2014. (Monesi Decl., Exs. 2-3.) Ms. Epps-Stowers's counsel, however, does not testify that she has personal knowledge of when and how Ms. Epps-Stowers signed up to use the Uber App. Yet Plaintiffs argue in their opposition brief that if "Ms. Epps-Stowers registered for an Uber account via Uber's website, she would have done so on the mobile webpage and would have been presented with the screens shown in Exhibits 2 and 3 to the

---

[6] Uber has attached to this brief the Affidavit of Christopher Butler, which shows what the website get.uber.com would have looked like on April 8, 2014 and on May 20, 2014. Given that Uber has received authenticated screenshots for the purposes of this proceeding, and in the interests of streamlining the issues, Uber is not relying on the previous screenshots submitted as Exhibits B and C to the Garrett Declaration (ECF Nos. 105-7, 105-9, 105-10.) The Internet Archive did not have a screenshot available from April 23, 2014. To determine the language that appeared on get.uber.com on April 23, 2014, Uber searched its repository of source code for the get.uber.com website.

Monesi Declaration….")  (Opp. at 13.).  Ms. Epps-Stowers's declaration, as well as her counsel's screenshots of the website m.uber.com, however, are contrary to Uber's contemporaneous records that are maintained in the regular course of business.

First, the testimony in Ms. Epps-Stowers's declaration regarding the device and website she used to register for Uber is contrary to Uber's records.  The registration records for Ms. Epps-Stowers show that she registered for Uber via a desktop computer by accessing the website get.uber.com.  Uber's contemporaneous records show that Ms. Epps-Stowers used a desktop to search in Google for the term "uber promo code."  If she had used a mobile phone to search for the term "uber promo code," different key words would have appeared in the log instead of "desktop."  Moreover, if Ms. Epps-Stowers had accessed and registered via the website m.uber.com, the log displaying records specific to her sign-up would have shown "muber"— Uber's internal name for the website m.uber.com.  Instead, the log shows "freecandy", Uber's internal name for the website get.uber.com.

Second, even if Ms. Epps-Stowers had used the website m.uber.com to register (she did not), she *still* would have seen a Terms of Service alert, including hyperlinks to the Terms & Conditions and Privacy Policy.  Plaintiffs' counsel erroneously relies on a January 22, 2014 screenshot of the website m.uber.com to argue that Ms. Epps-Stowers would not have seen a Terms of Service alert.  (Opp. at 5, 13.)  But the screenshot submitted by counsel does not accurately represent m.uber.com as Ms. Epps-Stowers would have seen it on April 23, 2014.  Uber's website source code shows that on April 23, 2014, the m.uber.com website included a Terms of Service alert and hyperlinks to Uber's Terms & Conditions and Privacy Policy.  Thus, regardless of whether Ms. Epps-Stowers signed up using m.uber.com or get.uber.com, the Terms of Service alert would have appeared on her screen right next to the button she clicked to complete her registration.  This objective indication of assent to the Terms binds Ms. Epps-Stowers.  *See Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990-92 (N.D. Cal. 2017).[7]

---

[7] This Court requested that Uber present evidence regarding what registration through the mobile app would have looked like for Ms. Epps-Stowers.  But to reproduce this specific sign-up screen flow, Uber requires information regarding which version of the Uber App was downloaded, as well as the user's specific device and operating system.  Because Uber's registration records show that Ms. Epps-Stowers registered on a desktop, Uber does not have the information needed to

### 2. Mr. Verklas Assented When He Registered to Use the Uber App

Mr. Verklas was also presented with an unobscured Terms of Service alert and hyperlink when he registered to use the Uber App on December 25, 2015. Uber's records show that when Mr. Verklas registered on December 25, 2015, Mr. Verklas was first presented with the unobscured Terms of Service alert and hyperlink when he arrived at the "REGISTER" screen, which informed Mr. Verklas that "BY CREATING AN UBER ACCOUNT, YOU AGREE TO OUR TERMS & CONDITIONS AND PRIVACY POLICY." The phrase "TERMS & CONDITIONS AND PRIVACY POLICY" was displayed in underlined, bright blue text, indicating that it was hyperlinked text. After entering his information, Mr. Verklas would have seen the unobscured Terms of Service alert a *second* time as soon as he began to enter a password. During the second time the alert appeared, the alert would have remained unobscured, even with the keypad engaged, and with no need to scroll. The unobscured Terms of Service alert appeared immediately below the "NEXT" button that Mr. Verklas clicked to complete his registration, and remained apparent until he clicked the "NEXT" button.

Mr. Verklas seemingly claims that he only registered in 2014. (Opp. at 13:4-11; Verklas Decl. ¶ 3.) Because Uber was able to identify only Mr. Verklas's 2015 account using the email address and phone number provided by Plaintiffs' counsel in July 2018, Uber requested that Plaintiffs provide any other email address or phone number used by Mr. Verklas to create an Uber account. Plaintiffs' counsel repeatedly ignored Uber's requests to provide such information, until after this Court's March 4, 2019 Order (ECF No. 116), when Plaintiffs' counsel finally provided Uber with a different email address and phone number for Mr. Verklas. Using that new information, Uber confirmed that Mr. Verklas registered to use the Uber App a *second time* on October 12, 2014, using a different email address and telephone number than those he used to register for his December 25, 2015 account.[8]

---

reproduce the signup process she would have encountered had she registered via Uber's app on her phone.

[8] The alleged cancellation fee complained of by Mr. Verklas was charged to his *2015 Uber account*, not his 2014 account. Mr. Verklas incurred *no* cancellation fees on his 2014 account. To the extent Mr. Verklas is relying solely on his 2014 account, which incurred *no* cancellation fees, Mr. Verklas lacks standing to bring his claims. *See Friends of the Earth, Inc. v. Laidlaw Envtl.*

When Mr. Verklas registered for his 2014 account, Mr. Verklas also assented to Uber's Terms and Conditions and Arbitration Agreement at that time. Like his December 25, 2015 agreement, Mr. Verklas would have seen the unobscured Terms of Service alert and hyperlink ─ not once, but *twice*. First, Mr. Verklas saw the unobscured Terms of Service alert when he first arrived at the Payment screen. Uber's records show that, while on the Payment screen, Mr. Verklas backgrounded the Uber App. When he returned to the Uber App, he arrived again at the Payment screen, where he would have seen the unobscured Terms of Service alert a second time. This sign-up flow constitutes reasonable notice of Uber's Terms as a matter of law.[9] *See Flores v. Uber Techs., Inc.*, No. 2:17-cv-08503-PSG-GJS, 2018 WL 5937253, at *4 (C.D. Cal. Sept. 5, 2018) (finding that Uber riders were on reasonable notice of the Terms through Uber's registration process); *Cordas*, 228 F. Supp. 3d at 990-92; *Johnson*, 2018 WL 4503938, at *4-5 (registration process on Android-operated smartphone gave reasonable notice of Uber's terms).

### 3. Plaintiffs Again Assented by Continuing to Use the Uber App After Receiving a November 2016 Email Notice of Updated Terms.

Each Plaintiff again assented to Uber's Terms of Service when they used the Uber App (for many rides) after receiving the November 2016 email notifying them that if they continued to use the Uber App, they were agreeing to be bound by the updated Terms of Service.

Courts regularly enforce agreements "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound."[10] *Nguyen*, 763

---

*Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) (Article III standing requires Plaintiff to show he has suffered an injury in fact that is concrete and particularized and not hypothetical).

[9] Regardless of whether Mr. Verklas recalls seeing the hyperlink, he was provided reasonable notice when he *twice* arrived at the Payment screen with the unobscured Terms of Service alert. *See West v. Uber Techs.*, No. 2:18-cv-3001-PSG-GJS, 2018 WL 5937253, at *3 (C.D. Cal. Sept. 5, 2018) (rejecting plaintiff's argument that, "[t]he keyboard immediately pops up, obscuring the reference to the Terms of Service" and finding assent to arbitration arising from a similar rider-side Uber arbitration agreement); *Webber v. Uber Techs.*, No. 2:18-cv-02941-PSG-GJS (C.D. Cal. Sept. 5, 2018), ECF No. 58 at 5-6 (rejecting plaintiff's argument that the keypad obscured the Terms and finding that the registration process provided reasonably conspicuous notice).

[10] Continued use as a form of acceptance is common in consumer agreement cases. *See, e.g., Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1386-87 (1993) (party receiving benefits of insurance manifested intent to accept renewal of policy); *Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133-35 (C.D. Cal. 2011) (under California law, plaintiff that

F.3d at 1177; *see also Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) ("Where an employee continues in his or her employment after being given notice of the changed terms or conditions, he or she has accepted those new terms or conditions."); *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (finding updated terms of use enforceable where "plaintiffs accepted and agreed to the current terms by continuing to use Facebook after receiving" email notice of updated terms).

Judge Gutierrez of the Central District of California recently analyzed the same November 2016 email in a case filed by an Uber rider and found assent on indistinguishable facts. In *West v. Uber Technologies, Inc.*, No. 2:18-cv-3001-PSG-GJS, 2018 WL 5937253 (C.D. Cal. Sept. 5, 2018), the court found assent to Uber's November 2016 Terms where "Plaintiff continued using the App and Uber's services for a year after *receiving* the email . . . Courts have found that when consumers *receive emails* such as this one, continued use of the service or product constitutes assent to the updated terms." *Id.* at *5 (emphasis added). Thus, contrary to Plaintiffs' assertions, what matters is their *receipt* of the email, not whether they opened and read the email. *See id.* Similarly, in *Webber v. Uber Technologies, Inc.*, No. 2:18-cv-02941-PSG-GJS (C.D. Cal. Sept. 5, 2018), Plaintiff declared, "I do not remember receiving and never saw an email from Uber in or around November 2016 that mentioned an update to the Terms of Use." *See Metter*, ECF No. 111-8 at ¶ 6. Notwithstanding, the court found assent based on the continued use doctrine. *Webber*, ECF No. 58 at 5-6. Indeed, to hold otherwise would allow those who benefit from using a company's products or services to avoid updated Terms by deliberately refusing to open any emails with subject lines indicating that updated Terms will apply.

Plaintiffs' continued use of and benefit from the Uber App constitutes their acceptance of the updated Terms. Uber's records show that both Plaintiffs received the November 2016 email.

---

did not expressly assent to arbitrate any disputes with employer was nonetheless bound by arbitration provision by accepting employment and declining to submit opt-out form); *Guerrero v. Equifax Credit Info. Servs., Inc.*, No. CV 11-6555 PSG (PLAx), 2012 WL 7683512, at *7 (C.D. Cal. Feb. 24, 2012) (plaintiff was bound by arbitration agreement where he was mailed the updated terms, failed to opt out, and thereafter continued to use his accounts)); *Herrington v. Union Planters Bank, N.A.*, 113 F. Supp. 2d 1026, 1032 (S.D. Miss. 2000) ("[T]he plaintiffs accepted the terms of the arbitration agreement by continuing to utilize their accounts.").

Ms. Epps Stowers used the Uber App to take 317 trips following receipt of this email. Indeed, the trip in which she was allegedly charged an improper cancellation fee occurred in January 2017, after she accepted Uber's revised terms. (Am. Compl. ¶ 34.) Mr. Verklas used the Uber App to take 28 trips following receipt of the November 2016 email. Like Ms. Epps Stowers, the trip in which he was allegedly charged an improper cancellation fee occurred on September 9, 2017, after accepting Uber's revised terms. (*Id.* ¶ 36.) Plaintiffs' continued use of the Uber App following receipt of the November 2016 email — which provided reasonable notice of the updated Terms — constitutes assent to Uber's Terms and Conditions, including the arbitration agreement.

Mr. Verklas claims that he has "not had access to the email account [he] used to register for Uber since at least December 2015," (Verklas Decl. ¶ 7), but he tellingly fails to identify which of his two email accounts he allegedly lost access to. Nor does he claim that he has no access to both email accounts. Based on Mr. Verklas's claim that he registered in 2014, it appears that Mr. Verklas is claiming that he lost access to the email address associated with his 2014 account. Even if this were true, Mr. Verklas still received the November 2016 email at the email address associated with his 2015 account. Indeed, since December 26, 2015, Uber's records show that Mr. Verklas opened five emails and "clicked" three additional emails — meaning that a link embedded in the email was clicked after the email was opened—from Uber.[11]

Regardless, Plaintiffs' claims that they did not read the email are irrelevant. Numerous courts have rejected similar arguments. *See O'Connor v. Uber Techs., Inc.*, 150 F. Supp. 3d 1095, 1101 (N.D. Cal. 2015) ("for the purposes of contract *formation*, it is essentially irrelevant whether a party actually reads the contract or not, ***so long as the individual had a legitimate opportunity to review it.***") (emphasis added) (citation omitted), *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018); *see also Grant v. Morgan Stanley Smith Barney LLC*, No. 16-81924-CIV-MARRA, 2017 WL 1044484, at *3 (S.D. Fla. Mar. 20, 2017) (enforcing an arbitration agreement that was sent in an email that Plaintiff did not read because "Plaintiff's decision not to open and

---

[11] This Court's March 4, 2019 Order (ECF No. 116) asked what inferences could be drawn as to whether Mr. Verklas was the person who opened the emails. Uber cannot identify the specific person who had access to Mr. Verklas's email account, who had opened the five emails and clicked on links embedded in three emails, but all of these emails were sent to the email address Mr. Verklas provided to Uber on December 25, 2015.

read an email does not render the arbitration agreement invalid and unenforceable."); *Kliff v. Hewlett Packard Co.*, 318 F. App'x 472, 474-75 (9th Cir. 2008) (rejecting plaintiff's argument that he was not bound by a provision because he did not read it); *Izzi v. Mesquite Country Club*, 186 Cal. App. 3d 1309, 1318-19 (1986) (rejecting plaintiff's challenge to an arbitration clause on the basis of her failure to read it). Because Uber sent the November 2016 emails to the email addresses provided to Uber by Plaintiffs, Plaintiffs had a "legitimate opportunity" to review the November 2016 email and Terms.[12]

Additionally, Ms. Epps-Stowers cannot avoid arbitration simply because she "does not remember" receiving the email. Courts have repeatedly rejected such attempts. *See Rezaeian v. Starbucks Corp.*, No. LA CV16-04599 JAK (ASx), 2017 U.S. Dist. LEXIS 102677, at *17 (C.D. Cal. Feb. 8, 2017) (enforcing arbitration agreement despite plaintiff's statement she did not "recall" signing the agreement); *Meyer*, 868 F.3d at 71, 80 (finding plaintiff was on inquiry notice regardless of his claim that he "[did] not recall seeing . . . the hyperlink"); *Vernon v. Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1151 (D. Colo. 2012) (whether plaintiffs could not recall whether they received letter was not sufficient to defeat motion).

Both Plaintiffs assented to Uber's Terms, including the arbitration provision, through their continued use of the Uber App after receiving the November 2016 Terms.

## V.   CONCLUSION

The Court should order Plaintiffs to individually arbitrate their claims against Uber and dismiss, or in the alternative, stay, Plaintiffs' claims pending the outcome of arbitration.

---

[12] This Court's March 4, 2019 Order (ECF No. 116) asked what Uber's records indicate regarding whether Plaintiffs received and/or opened the November 2016 email. While Uber's records show that Mr. Verklas and Ms. Epps-Stowers each received the November 2016 email, Uber's records do not show that Mr. Verklas or Ms. Epps-Stowers opened the email.

Dated: April 15, 2019

TIFFANY CHEUNG
CLAUDIA M. VETESI
LUCIA X. ROIBAL
MORRISON & FOERSTER LLP

By:    /s/ *Tiffany Cheung*
        Tiffany Cheung

Attorneys for Defendant
UBER TECHNOLOGIES, INC.